UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Victor L. Smith,**

        *Plaintiff,*

v.                                                                                     Case No. 3:15-cv-054
                                                                                  Judge Thomas M. Rose

**City of Troy,** *et al.*,

        *Defendants.*

---

**ENTRY AND ORDER GRANTING IN PART MOTION OF DEFENDANTS, CITY OF TROY, OHIO, PATROLMAN S.A. GATES, PATROLMAN H. HOHENSTEIN, AND PATROLMAN C.A. MADIGAN FOR SUMMARY JUDGMENT. DOC. 48, AND DEFENDANTS MIAMI COUNTY AND DEPUTY PHILLIP OSTING'S MOTION FOR SUMMARY JUDGMENT. DOC. 51. SUMMARY JUDGMENT IS AWARDED ON PLAINTIFF'S CLAIMS ARISING UNDER FEDERAL LAW. PLAINTIFF'S REMAINING CLAIMS ARE STATE-LAW CLAIMS WHICH ARE DISMISSED WITHOUT PREJUDICE. THE OHIO DEPARTMENT OF MEDICAID'S CROSS-CLAIM, DOC. 34, IS LIKEWISE DISMISSED WITHOUT PREJUDICE.**

---

Pending before the Court are two motions: Motion of Defendants, City of Troy, Ohio, Patrolman S.A. Gates, Patrolman H. Hohenstein and Patrolman C.A. Madigan for Summary Judgment, Doc. 48, and Defendants Miami County and Deputy Phillip Osting's Motion for Summary Judgment. Doc. 51. Movants request that the Court award them summary judgment on all counts of Plaintiff Victor L. Smith's Complaint. Doc. 1. The complaint first alleges the Defendant Officers violated Plaintiff's civil rights as protected under 42 U.S.C. § 1983 by use of

1

unreasonable and excessive force; next alleges a violation of the same statute by failure to intervene; then asserts municipal liability on the part of the City of Troy and Miami County by virtue of negligent hiring and retention and failure to train; then followed by federal claim for violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and state law claims for battery and intentional infliction of emotional distress.  The Ohio Department of Medicaid has filed a cross-claim, seeking to recover the amount expended for medical services and care expended for Plaintiff. Doc. 34.

**I.     Background**

On February 11, 2014, at 10:38 a.m., while driving home, Plaintiff Victor L. Smith, who suffers from epilepsy, began to sense an oncoming seizure. (Smith Dep., pp. 23-24, 59-61, 64). His vehicle left the road into the front lawn of 449 Glendale Drive. (Smith Dep. at 59-61, 64). Suffering from the effects of the seizure, Smith exited his vehicle and went to the rear side of the residence, where he found a 3-foot high chain link fence, upon which he steadied himself. Id. at 67-71.

At approximately 10:40 a.m., the Miami County Communications Center received a 9-1-1 call about suspicious activity in the vicinity of 449 Glendale. (Exhibit 2, Affidavit of Terri Ray, ¶¶ 1-6 and Exh. 2-B (communications log)). There was another report of a man honking the horn of his car, leaving the scene and removing his clothes. (Dep. of P.M. Osting, Jr. at 25-26 and Dep. Exh. 2). Dispatch radioed Defendant City of Troy Police Officers Gates and Hohenstein and dispatched them to the scene. (Exh. 2, Ray Aff., Exh. 2-B; see Exh. 1, Gates Aff., ¶¶ 4, 12 (unit numbers)). On his way, Officer Gates was stopped by a passing train. (Exh. 1, Gates Aff., ¶ 14). Defendant Miami County Sheriff's Deputy P.M. Osting Jr. heard the dispatch, was in the area of

449 Glendale, responded to the scene, and was the first to arrive at approximately 10:44. (Osting Dep. at 41-42; Exh. 2, Ray Aff., Exh. 2-B).

When Osting arrived, he saw a car in the snowy yard, without a driver but with its radio playing loudly. (Osting Dep. at 44). Osting then observed Plaintiff in the back yard. Plaintiff was yelling "Baby" or for someone; his pants were down at his knees and he was swaying back and forth while grabbing a waist-high chain link fence. (Id. at 46). From about 25 feet away, Osting commanded Plaintiff to come with him to discuss why his car was in the yard. (Id. at 52). Plaintiff did not respond. Osting approached Plaintiff from behind on his right side and repeated his commands. Plaintiff did not comply and yelled, "Baby." (Id. at 52-53). Osting "thought he was under the influence of something the way he was acting. He was sweating. It was a cold day to be sweating as much as he was." (Id. at 53). Smith claims to have told Osting he was having a seizure. (Smith Dep. at 72-74, PageID 488-89).[1]

At that point, Osting attempted to gain physical control:

> Basically, he wasn't responding so I—his right arm that was on the fence, I placed my hand on top of his, my other arm on his back, advised him he needed to go with me back to where the accident occurred so we can figure things out—figure out what happened.
>
> * * *
>
> At that point he tensed up. That is when I took his fingers that were on there, started to peel them off the fence. Once I got them off, he pulled his arm away.
>
> * * *
>
> Once he pulled away from me, that is when I placed my leg behind his, basically did a leg sweep, and went down to the ground with him.

---

[1] As will be discussed, Plaintiff has also testified that he does not recall anything after leaving the road.

(Id. at 54, 55).

Officer Gates arrived at the scene shortly after Osting. (Exh. 2, Ray Aff., Exh. 2-B). The first thing Gates heard was Osting telling Plaintiff to comply. (Exh. 1, Gates Aff., ¶ 21). The first thing Gates saw was Plaintiff on the ground apparently fighting with Osting while Osting attempted to handcuff Plaintiff. (Id., ¶ 22). Gates ran to assist. (Id.)

Defendant City of Troy Police Officer Hohenstein arrived a few seconds later. (Exh. 3, Hohenstein Aff., ¶¶ 20, 22). Smith was face down when Gates reached him. (Exh. 1, Gates Aff., ¶ 23). Smith's right arm was still under him. (Id., ¶ 26; see Exh. 3, Hohenstein Aff., ¶ 23). The Troy officers are trained that, when an individual refuses to show his hands, he could be getting a weapon or hiding evidence. (Exh. 1, Gates Aff., ¶ 27; Exh. 3, Hohenstein Aff., ¶ 24; Exhibit 4, Aff. of C. Madigan, ¶ 26.) Gates positioned himself at Plaintiff's head and echoed the order to stop resisting and place his hands behind his back. In addition, Gates showed Smith his Taser and warned Smith that he would be tasered if he did not comply. Smith looked at Gates but did not place his hands behind him. (Exh. 1, Gates Aff., ¶¶ 24-25).

The officers are trained to use the Taser's two modes: 1) to fire probes that contact an individual and produce temporary neuromuscular incapacitation; and, 2) the "drive stun" mode, where probes are removed from the Taser and the Taser is manually placed in contact with an individual, causing temporary pain to bring the person into compliance. (Exh. 1, Gates Aff., ¶ 10; Exh. 3, Hohenstein Aff., ¶ 10; Exh. 4, Madigan Aff., ¶ 10). The officers are trained, and know from experience, that if they can hear an arcing sound while in drive stun mode, the Taser is not in contact with the person. (Exh. 1, Gates Aff., ¶ 29; Exh. 3, Hohenstein Aff., ¶ 27). Gates decided to use his Taser. (Exh. 1, Gates Aff., ¶ 28; see Exhibit 5, Aff. of Maj. Steve Ijames, ¶¶ 1-10 and Exh. 5-A (Report at 7)).

4

Defendants arrived and jumped on top of Smith, holding him down while Gates drive-stunned him repeatedly. (Gates Dep. at 54-62; Osting Dep. Ex. 2). From the time Osting arrived on scene until Smith was first drive stunned, a total of 1 minute and 11 seconds had elapsed. (Ijames Dep. pp. 114-116).

Gates drive-stunned Plaintiff for close to a minute. (Exh. 2, Ray Aff, and Exh. 2-H (Taser log); see Exh. 1, Gates Aff., ¶¶ 28-35; Exh. 3, Hohenstein Aff., ¶¶ 26- 28; Exh. 4, Madigan Aff., ¶¶ 24-25, 27-28). At first, he applied the Taser to Smith's lower neck and upper back; however, Osting felt its effects, so he moved the Taser lower but Gates then felt it, and then moved the Taser lower. (Exh. 1, Gates Aff., ¶ 30; Osting Dep. at 69). Gates and Hohenstein could hear the arcing sound while Gates used his Taser. (Exh. 1, Gates Aff., ¶¶ 29, 31; Exh. 3, Hohenstein Aff., ¶ 27). In addition, Smith did not respond but continued to move, which caused the Taser repeatedly to break contact with his body. (Exh. 1, Gates Aff., ¶¶ 31-32).

A Taser keeps a digital record of the times it is discharged and the data may be downloaded into a log format. (See Exh. 2, Ray Aff., Exh. 2-H). Officer Gates was surprised to learn that his Taser log of the encounter showed a 53-second duration. (Exh. 1, Gates Aff., ¶¶ 42-43). The officers' recognition of the Taser's arcing sounds, Officer Gates' repeated relocation of the Taser, and the Plaintiff's continual active resistance shows the Taser contacted Plaintiff for something less than 53-seconds. None of the officers, all of whom are Taser-trained, believed Officer Gates' Taser use was inappropriate. (Exh. 1, Gates Aff., ¶ 44; Exh. 3, Hohenstein Aff., ¶ 34; Exh. 4, Madigan Aff., ¶ 31; Osting Dep. at 77-78).[2]

---

[2] Defendants attempt to introduce expert testimony through Ijames. PageID 246. According to Ijames, Officer Gates' efforts to secure Plaintiff's right arm while applying the Taser reveals an unintentional cycling of the Taser:

> This suggests that interlimb interaction played a role in what appears to be the accidental

The Defendant Officers acknowledged that prior to being taken to the ground and being drive-stunned, Smith never made any attempt to harm anyone. (Ijames Dep., p. 108; Osting Dep. at 62-63). At the same time, Smith would not give Osting control of his arm. (Osting Dep. at 82-83).

According to Gates' Taser data log, over the course of 53 seconds, Gates drive-stunned Smith eight times, for a total exposure of 48 seconds, which equates to over nine five-second cycles. (Gates Dep. at 61-62; Gates Dep. Ex. 17[3]; Ijames Dep. 150).

Gates receives training in the use of a Taser at least once every two years. (Gates Dep. at 86-87). Drive-stun mode is a pain compliance technique and when the trigger is pulled, the device cycles continuously for five seconds. (Ijames Dep. 43-44). To start another cycle, the trigger must be pulled again. Id. Officers are trained they must give an individual "a break between cycles to allow the subject to have a chance to comply with what you're telling them to do." Id. at 123.

Smith did not react to being Tasered nor did he comply with the officers' orders to show his hands and place his arms behind him. He merely stated he needed to use the rest room, attempted to stand, and continued to yell, "Baby." (Exh. 1, Gates Aff., ¶¶ 28, 32-34; Exh. 3, Hohenstein Aff., ¶¶ 26, 28, 30; Exh. 4, Madigan Aff., ¶¶ 24-25, 27-28). It was only the officers' continued and ultimately successful efforts to gain control of Smith's right arm that allowed them to handcuff Smith.

---

    and unintended/unconscious manner in which the TASER was deployed. Interlimb interaction is a process that has been well documented in police practice, where the non-weapon hand closes-as in this circumstance where Gates was attempting to remove and control Smith's arm-resulting in the involuntary clenching of the weapon (TASER) hand with related weapon activation.

Id. (citing Exh. 5, Ijames' Aff. and Exh. 5-A (Report at 11)).

[3] TASER Evidence Sync, logging the trigger pulls on Officer Gates' department-issued TASER X26 on February 11, 2014. Identified during Officer Gates' and Major Ijames' depositions.

Once handcuffed, the officers assisted Smith to his feet and began to walk him to the street. (Exh. 1, Gates Aff., ¶¶ 34, 36; Exh. 3, Hohenstein Aff., ¶ 29; Exh. 4, Madigan Aff., ¶¶ 28-29). Gates asked Smith his name and, when told, he recognized Smith for the first time. (Exh. 1, Gates Aff., ¶ 36; see Exh. 3, Hohenstein Aff., ¶ 31; Exh. 4, Madigan Aff., ¶ 29). Gates previously responded to Smith's parents' residence to assist medical squad personnel responding to a report that Smith had a seizure. Smith had become violent and had broken a glass table, which led to the call for police assistance. Gates was required to restrain Smith. (Exh. 1, Gates Aff., ¶ 38). On February 11, 2014, however, none of the officers recognized Smith nor understood that he was suffering from a medical condition. (Exh. 1, Gates Aff., ¶¶ 32, 36; Exh. 3, Hohenstein Aff., ¶¶ 30-31; Exh. 4, Madigan Aff., ¶¶ 27, 29).

Ultimately, at 10:47:51 a.m. – just 1 minute, 59 seconds after Osting first arrived on-scene – the officers handcuffed Smith, pulled him to his feet, and dragged him to a police cruiser. (Gates Dep. at 63- 64; Gates Dep. Ex. 4-B). Smith claims that, while he was on the ground, he suffered another seizure, was disoriented, and drifted in and out of consciousness, which affected his memory of the attack. (Smith Dep. at 82-83). After drive stunning Smith, Gates called for a tow-truck. (Gates Dep. at 97-98, 112; Gates Dep. Exs. 4-B and 20).

The Troy officers' supervisor, Sgt. R. Gumerlock, arrived at the scene just as Smith was handcuffed and called for an ambulance. According to Major Ijames, after "15 seconds (of exposure), you certainly need to be medically cleared after you're exposed" to the Taser. (Ijames Dep. at 80). Gumerlock, however, advised the medics they were being called because Smith was "sweating," and did not mention that he had been drive stunned. (Gates Dep. at 112-13; Gates Dep. Ex. 4-B). The officers remained with Plaintiff until the squad arrived. The squad took Plaintiff to Upper Valley Medical Center. (Exh. 1, Gates Aff., ¶¶ 37, 39; Exh. 3, Hohenstein Aff., ¶ 32; Exh.

7

4, Madigan Aff., ¶ 30).5 At the hospital, Plaintiff told the attendants he had a seizure from eating too much dairy. (Exhibit 6, Certified UVMC record).

Later that day, Officer Gates spoke with Plaintiff at the hospital and took photographs of Plaintiff. Plaintiff told Officer Gates he had no recollection of the incident other than driving his car on Staunton Road prior to the accident, and that he had no recollection of being Tasered. (Exh. 1, Gates Aff., ¶¶ 40-41 and Exh. 1-1). The Police Department conducted an investigation and found no policy or training violations. (Exh. 2, Ray Aff., Exh. 2-G (investigation report); see Exh. 1, Gates Aff., ¶ 45; Exh. 3, Hohenstein Aff., ¶ 35; Exh. 4, Madigan Aff., ¶ 32).

Smith claims that he suffers from post-traumatic stress disorder and feels anxious and fearful being around or even seeing police officers. (Smith Dep. at 168-69). Smith sued the responding officers, as well as the City of Troy, Ohio and Miami County, Ohio. He asserts federal claims for unreasonable and excessive force; failure to intervene; municipal liability on the theory of negligent hiring and detention; failure to train; and, violation of the Americans with Disabilities Act ("ADA"). Smith brings state-law claims for assault, battery, and intentional infliction of emotional distress. (ECF No. 1, Compl.)

**II.    Standard**

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must

8

prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the non-moving party. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

The general notion to view evidence in Plaintiff's favor is inapplicable when Plaintiff cannot recall material events. Then, a court is "not obligated to treat a naked assertion in a litigation document as establishing a 'fact' when [plaintiff] he admits to having neither personal knowledge nor other evidence to support his claim." *Wysong v. City of Heath*, 260 Fed. Appx. 848, 857 (6th Cir. 2008). "[A] plaintiff's inability to recall pertinent events and speculation on what may have occurred is insufficient to create a genuine issue of material fact in light of specific evidence to the contrary." *Stanley v. Deluxe Financial Services Inc.*, N.D. Ohio No. 1:08CV2149, 2009 WL 929029, *5 (Apr. 2, 2009) (citing *Wysong*). Similarly, internally inconsistent deposition testimony does not rise beyond speculation to create a triable issue. *In re Asbestos Products Liab. Litigation (No. V)*, 578 Fed. Appx. 160, 162 (3d Cir. 2014); *Steinhauer v. DeGolier*, 359 F.3d 481, 484 n.1 (7th Cir. 2004).

**III.  Excessive Force**

A person has a right under the Fourth Amendment to be free from the use of excessive force during an arrest. U.S. Const. amend. IV.  For the violation of constitutional rights, a party may bring a cause of action under 42 U.S.C. § 1983, which states in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage of any state ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws" shall be liable at law or in equity to the injured party.  Section 1983 does not confer any substantive rights, but rather serves

as a vehicle through which the violation of constitutional rights may be vindicated. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

"[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, ⸺ U.S. ⸺, 135 S.Ct. 2466, 2473 (2015). "Objective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Factors to consider include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (citing *Graham*, 490 U.S. at 396). *See also Morabito v. Holmes*, 628 F. App'x 353, 357 (6th Cir. 2015).

Law enforcement officials are not necessarily precluded under federal law from arresting someone who displays symptoms of a known medical condition. *Everson v. Leis*, 556 F.3d 484, 499 (6th Cir. 2009)(citing *United States v. Villagrana–Flores*, 467 F.3d 1269, 1274 (10th Cir. 2006) ( "Merely because an individual can be detained for mental health reasons, however, does not rule out the possibility that the same individual can alternatively be detained for committing crime.... All that is required is a particularized and objective basis for suspecting the particular person stopped of criminal activity." (internal quotation marks omitted))).

> [T]he Sixth Circuit has affirmed…that using a Taser to restrain an individual who resisted being handcuffed did not shock the conscience. *Francis v. Pike County*, 708 F. Supp. 170 (S.D. Ohio 1988), aff'd 875 F.2d 863 (6th Cir. 1989). This Court and sister district courts have also found that tasing an individual who actively resists being handcuffed surpasses the substantially lower standard a plaintiff must meet under the Fourth Amendment. See *Edwards v. City of Martins Ferry*, 554 F. Supp. 2d 797 (S.D. Ohio 2008) (82 year-old suffering from Alzheimer's Disease was

tased after resisting being handcuffed during an arrest for urinating in a park); *Turner v. City of Toledo*, 2012 U.S. Dist. LEXIS 66908, 2012 WL 1669836 (N.D. Ohio 2012) ("But even viewing the facts in the light most favorable to Plaintiff, it is undisputed that 'Mr. Turner attempted to pull his arms free from the grasp of the officers,' resulting in a 'physical struggle,' albeit one that was 'very brief [and] minor ....' [making] Lewis' use of the taser [ ] reasonable under *Graham*" ).

*Shreve v. Franklin Cty., Ohio*, S.D. Ohio No. 2:10-CV-644, 2013 WL 30056, *8-9 (Jan. 2, 2013), aff'd, 743 F.3d 126 (6th Cir. 2014). Plaintiff pulled his right arm under his body and resisted commands to show his hand as well as the officers' physical efforts to free his arm. This constitutes "active resistance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015); *Shreve*, 2013 WL 30056, *8-9.

While Plaintiff wishes to claim that he told the responding officers he was having a seizure, this claim lacks personal knowledge, as he has no recollection of this.

> Q Okay, but you do recall telling him the only thing you remembered was being on Stanton Road and feeling bad, correct?
>
> A Yes, sir.
>
> Q All right. That was the night of the incident. When did you begin to remember the other events that occurred during the incident?
>
> A Well, once he -- he come to the hospital and started like telling me almost what happened, then I went to the police station looking for my belongings and -- I -- they didn't have them and then I started putting it together of what really happened.

Smith Depo. 136, ll. 5-16, PageID 504.

Plaintiff recounted how he was able to tell a psychological counselor he had been tased ten times:

> Q Also, your first visit to Ms. Stephenson, do you remember that you told her that the police Tased you ten times while on the ground?

11

>A I don't remember but I could have said that.
>
>Q Okay. And how would you have known that? I thought your testimony was that you didn't remember any of the Tasing?
>
>A I took the pictures of the marks all over my back and -- you can just count them up.
>
>Q You knew they were Taser marks?
>
>A Yes, sir.
>
>Q How did you know that?
>
>A Because they were -- marks from a Taser on my back and that's how they got there.
>
>Q Okay. Did you see the mark?
>
>A And Officer Gates come to the hospital and took the pictures of the Taser marks and so that's how I knew actually.

Smith Depo. 134, l. 20–135, l. 12, PageID 504.

Allowing the non-movant to create a genuine issue of material fact based upon self-serving, contradictory depositions and affidavits undermines the "utility of summary judgment as a procedure for screening out sham issues of fact." *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); see also *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998).

The Court finds as a matter of law that the Defendant Officer did not utilize excessive force against Plaintiff.  In an age when we face too many instances of officers resorting to lethal force when confronted with an individual who defies orders and reaches where officers cannot see, the Court cannot conceive of finding liability on the part of officers who reached for a measured force in response to a dangerous, tense situation.

### IV. Qualified Immunity

Even if Plaintiff were able to show excessive force had been used, qualified immunity would still protect the individual officers. Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A qualified immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established. *Pearson*, 555 U.S. at 232. These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages. *Pearson*, 555 U.S. at 236; *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

Plaintiff points to *Kent v Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016) and *Eldridge v. City of Warren*, 533 Fed. Appx 529, 532 (6th Cir. 2013) as cases clearly establishing the right he claims was violated. In *Kent* the Sixth Circuit denied qualified immunity to officers where "Plaintiff's actions did not amount to an immediate threat to [officer] safety to justify tasing." 810 F.3d at 393-394. In *Eldridge*, there was no threat to officers or public at-large, where Eldridge "was not threatening either verbally or physically." 533 Fed. Appx at 533.

The crux of this case, however, is that Smith's arm reached underneath himself while he was on the ground. This is an immediate threat to an officer legitimately attempting to handcuff someone. It constitutes a threat to the officers and potentially the public at large.

### V. *Monell* Liability

Before a municipality can be held liable under Section 1983, a plaintiff must show injuries that were caused by some "policy or custom" attributable to the municipality. *Vann v. City of New*

13

*York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989)(quoting *Monell*, 436 U.S. at 690). Under *Monell*, a municipality is liable only where its policies are the "moving force" behind the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694).

Four types of *Monell* claims have been recognized in the Sixth Circuit: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d at 478.

In this case, Plaintiff alleges the Defendant Departments both ratified their officers' unreasonable acts by retaining and failing to investigate and failing to train their officers on how to recognize and deal with individuals suffering from seizures.

This standard is not satisfied in this case. There is no pattern of unconstitutional practices in this record, nor is there any evidence of failure to train, or training that is reckless or grossly negligent. Plaintiff has not produced evidence that would support a *Monell* claim.

Plaintiff bases his *Monell* argument on an alleged inadequate investigation by the City of Troy equating to ratification of their officers' actions. To succeed on this claim, Plaintiff "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the" harm. *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). "This rule is most consistent with our admonition in *Monell*[ v. *Dept. of Social Services of City of New York*, 436 U.S. 658 (1978)] … that a municipality can be

14

liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (internal citations omitted). The problem for Plaintiff is that he must show that Troy's alleged "failure to investigate must be indicative of an official policy." *Gorecki v. City of Cambridge*, S.D.Ohio No. C2-07-420, 2009 WL 3242296, *2 (Oct. 8, 2009).

Plaintiff cannot establish ratification based on a failure to investigate because he does not identify record evidence of deliberate indifference. Deliberate indifference "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller v. Calhoun Cty.*, 408 F.3d 803, 815 (6th Cir. 2005). Here, Plaintiff does not cite to any prior unconstitutional actions by the Troy Defendants. Without evidence of a pattern of unconstitutional acts, Plaintiff cannot establish a City policy was the moving force behind an alleged constitutional violation.

For the same reason, Plaintiff cannot prevail on his failure-to-train theory. "We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Plaintiff does not and cannot point to record evidence of a pattern of constitutional violations; therefore, without evidence of deliberate indifference, the Court will grant summary judgment on Plaintiff's *Monell* liability claim.

Similarly, Plaintiff failed to identify "any prior allegedly unconstitutional conduct which would have placed Miami County on notice that its training was inadequate." *Weathers v. Anderson*, 2012 WL 1593136, at *3 (W.D. Ky. May 4, 2012) (citing *Connick v. Thompson*, 561 U.S. 51, 62 (2011) ("Without notice that a course of training is deficient in a particular respect,

15

decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.")). Plaintiff cannot show that Miami County was on notice that its training on handling individuals suffering from seizures was inadequate. Thus, Miami County is also entitled to summary judgment.

Deputy Osting was trained on use of force and use of taser. (Osting Dep. Tr. 9, 19- 21). Therefore, for the reasons set forth in its motion, Miami County is entitled to summary judgment.

## VI.     Americans with Disabilities Act

Plaintiff argues that Miami County should be liable under the Americans with Disabilities Act based on the County's prior interactions with him and his claim to have declared himself to be having a seizure. Under the Americans with Disabilities Act ("ADA"), a "plaintiff must show that the defendant took action because of the plaintiff's disability…." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). Plaintiff states, "[T]he Defendant Departments knew or should have known he was disabled, based on their prior interactions with him." (ECF No. 55, Pl.'s Consolidated Mem. Contra, etc., PageID 1405).

Plaintiff had no prior interaction with Deputy Osting or the Miami County Sheriff's Office. (Smith Dep. Tr. at 71-72). There is no credible evidence that Plaintiff told Osting that he was suffering a seizure. (Osting Dep. Tr. at 80). Osting observed no signs indicating that Plaintiff was in medical distress. (Osting Dep. Tr. at 78, 80). Osting believed Plaintiff was under the influence. (Osting Dep. Tr. at 53). Neither the County nor Osting had reason to believe Plaintiff suffers from seizures triggering any duty under the Americans with Disabilities Act.

Plaintiff also argues that Miami County's alleged failure to train its officers on confronting individuals suffering from seizures denied him the benefits of law enforcement services in violation of the Americans with Disabilities Act. However, as previously discussed, it was not

the officers' training, but rather Plaintiff's own actions that precipitated the need for officers to restrain him.

He fails, however, to point to record evidence of the City's prior interactions, what the City knew about the interactions, and how the City took action against him because of his alleged disability. Neither can Plaintiff show Officer Gates knew Plaintiff's identity prior to restraining him or knew of his disability until after he was restrained. If Defendants were unaware of Plaintiff's disability, they cannot have taken action because of it. Plaintiff cannot prevail on his ADA claim if Defendants did not know that the person they were interacting with was disabled.

## VII. Conclusion

Because Defendants did not use excessive force in their encounter with Plaintiff and because the actions Plaintiff decries have not been clearly established as unconstitutional, Defendants are **AWARDED** summary judgment on this claim. Because the absence of an underlying constitutional violation makes it impossible for the government entities to ratify or fail to train and because they did adequately train, Defendants Miami County and City of Troy are **AWARDED** summary judgment on Plaintiff's *Monell* claim. Because Plaintiff cannot show Defendants knew of his disability, and thus cannot show his disability motivated any actions against him, summary judgement is **AWARDED** on Plaintiff's Americans with Disability Act claim.

Motion of Defendants, City of Troy, Ohio, Patrolman S.A. Gates, Patrolman H. Hohenstein and Patrolman C.A. Madigan for Summary Judgment, Doc. 48, and Defendants Miami County and Deputy Phillip Osting's Motion for Summary Judgment, Doc. 51, are thus **GRANTED IN PART**, as summary judgement has been awarded on Plaintiff's federal claims.

Although Section 1367(a) of title 28 of the United States Code authorizes district courts to exercise supplemental jurisdiction over state law claims, this does not mean that district courts must exercise jurisdiction in every case. *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 172 (1997). Supplemental jurisdiction is "'a doctrine of discretion, not of plaintiff's right....'" Id. (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Section 1367(c) of title 28 of the United States Code specifically provides that district courts may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Thus, in light of the dismissal of all federal law claims, the court must determine whether to exercise supplemental jurisdiction over the remaining state law civil assault claim. Judicial economy, fairness, convenience and comity are all considerations that are to guide a district court's decision whether to defer to a state court rather than retaining and disposing of a state law claim. *Gibbs*, 383 U.S. at 726-27. However, when the federal claims are resolved before trial, the district court should usually decline to exercise jurisdiction over the state law claims and allow the plaintiff to pursue them in state court. See, *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) ( "When all federal law claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims...."). In light of the dismissal of the federal law claims prior to any trial in this matter and finding no consideration requiring the court to retain and dispose of plaintiff's state law claim, the court, in its discretion and pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

The Clerk is **ORDERED** to **DISMISS** the instant action. Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. The Ohio Department of Medicaid's Cross-Claim, Doc. 34, is likewise **DISMISSED WITHOUT PREJUDICE.** The CLERK is **ORDERED** to

**TERMINATE** the instant action from the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, November 14, 2016.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
